UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                          **Hon. Hugh B. Scott**

                                          09CR51A

v.                               **Report & Recommendation**

Carlo J. Nappi,

            Defendant.

Before the Court is the defendant's motion to dismiss (Docket No. 32).

**Background**

This case revolves around the alleged sale of untaxed cigarettes on a Native American reservation to non-Native Americans in violation of the Contraband Cigarette Trafficking Act (18 USC § 2341 et seq.)("CCTA"). On February 19, 2009, the defendant Carlo J. Nappi ("Nappi") was charged by a Grand Jury for the Western District of New York as follows: conspiracy to possess and transport contraband cigarettes in violation of 18 USC §2342(a) (Count 1); unlawful shipping, possession or selling cigarettes between January 12, 20004 and February 18, 2004 (Count 2); unlawful shipping, possession, or selling cigarettes between February 17, 2004 and March 3, 2004 (Count 3); unlawful shipping, possession, or selling cigarettes between March 8, 2004 and March 10, 2004 (Count 4); unlawful shipping, possession,

or selling cigarettes: between March 23, 2004 and March 24, 2004 (Count 5); unlawful shipping, possession, or selling cigarettes between March 30, 2004 and March 31, 2004 (Count 6)[1]; wire fraud involving electronic money transfers in violation of 18 USC §1343 and 2 (Counts 7-11); two counts of engaging in money transactions derived from specified unlawful activity in violation of 18 USC §1957 and 2 (Counts 12-13); and the forfeiture of certain assets, including $609,880.90, pursuant to 18 USC § 981(a)(1)(C) and 28 USC §2461(c) (Count 14).

**Motion to Dismiss**

The defendant seeks the dismissal of Counts 1 through 6 of the indictment on due process grounds alleging that the state tax statute which purportedly required the excise tax to be paid did not provide the defendant with sufficient notice that the conduct in question was prohibited by law. (Docket No. 32 at ¶2).

The challenged counts are based upon 18 USC §2342(a) which provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." Contraband cigarettes is defined in 18 USC §2341 as follows:

> the term "contraband cigarettes" means a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other

---

[1] Counts 2 through 6 are all alleged to be in violation of 18 USC §§ 2342(a) and 2.

2

than [certain exempted persons].[2]

18 U.S.C.A. § 2341(2).

It is undisputed that at the times alleged in Counts 1 through 6, §471 of the New York State Tax Law read in relevant part:

> There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax.... It shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable hereunder shall be upon the person in possession thereof.

N.Y. Tax Law § 471(1) (McKinney 2008); see defendant's motion, Docket No. 32 at page 3.

The defendant points to the somewhat tortured history regarding the attempts to collect sales tax on cigarettes for on-reservation sales to non tribal members. (Docket No. 32 at pages 3-6). The Second Circuit, in United States v. Morrison, 686 F.3d. 94 (2d Cir. 2012)[referred to as Morrison II"], recently recounted this history:

> Prior to 1988, despite Supreme Court precedent suggesting that the states could permissibly tax cigarettes that were sold on-reservation to non-Native Americans, New York had not attempted to collect taxes on such sales. ... After the DTF[3] discovered that non-Native Americans were purchasing large quantities of tax-subject cigarettes from on-reservation retailers, however, it promulgated regulations to enforce the collection of taxes on those sales. Shortly after the DTF promulgated these regulations, Native American retailers sued to enjoin their enforcement. Litigation followed, with the United States Supreme Court ultimately rejecting the retailers'

---

[2] The defendant does not allege that he is an exempted person.

[3] The New York State Division of Taxation and Finance ("DTF").

3

> challenge. See Dep't of Taxation & Fin. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 78 (1994). Nevertheless, just as it had during the Milhelm Attea litigation, the DTF followed a formal policy of "forbearance" even after that case was decided. Specifically, pursuant to this policy, the DTF did not enforce its regulations governing on-reservation sales to non-Native Americans.

Morrison II, 686 F.3d at 99-100. The Second Circuit further detailed the State's efforts to enforce the statute.

> In 1996, New York State Governor George Pataki announced his intention to enforce the DTF regulations. In 1997, however, he reversed his stance and ordered the DTF to repeal them.[4] ... When New York attempted more aggressive enforcement strategies and started intercepting and seizing cigarette shipments headed into reservations, Native Americans resisted. This resulted in civil unrest, personal injuries, and significant interference with public transportation on New York highways. The DTF ultimately repealed its regulations in 1998. Although Governor Pataki subsequently sponsored amendments to the Tax Law that would have permitted on-reservation retailers to sell cigarettes tax-free, the New York legislature never passed such legislation. As a result, Section 471's prohibition on unstamped cigarette sales remained in effect.

Morrison II, 686 F.3d at 100. In the instant case, the conduct alleged to be the basis for Counts 1 through 6 took place between 2002 and 2004 (Docket No. 1). Thus, while the legislative amendments to §471 and the subsequent enactment of various regulations may not be directly relevant to the instant charges, they are relevant to the defendant's arguments regarding the procedural history surrounding the enforcement (or lack thereof) of the tax statutes with respect

---

[4] "Prompting Governor Pataki's reversal was a combination of legal barriers presented by tribal immunity and the resistance of New York's Native American population. Tribal immunity prevented New York from (a) suing Native American retailers who refused to pay the tax, (b) sending auditors onto reservations to examine retailers' records, (c) compelling retailers to register their businesses with the state, or (d) requiring retailers to send their records off-reservation." Morrison II, 686 F.3d at 100.

to the on-reservation sales of cigarettes to non-tribal members and the judicial construction of §471. In 2005, New York amended §471-e to provide that "all cigarettes sold on an Indian reservation to non-members of the nation or tribe or to non-Indians shall be taxed, and evidence of such tax will be by means of an affixed cigarette tax stamp." N.Y. Tax Law § 471–e(1)(a) (McKinney 2010) (subsequently amended 2010).[5] Section 471-e was supposed to take effect on March 1, 2006 "provided that any actions, rules and regulations necessary to implement the provisions of [the statute] on its effective date are authorized and directed to be completed on or before such date." Morrison II, 686 F.3d at 100 citing 2005–63 N.Y. Consol. Laws Adv. Legis. Serv. * 15 (LexisNexis). However, the DTF did not complete the necessary rules and regulations, but instead issued an advisory opinion which stated that, pursuant to its forbearance policy, it would not enforce Section 471–e. Subsequently, in Day Wholesale, Inc. v. State of New York, 856 N.Y.S.2d 808 (2008), the Appellate Division, Fourth Department ruled that Section 471–e was not "presently in effect" due to the DTF's failure to promulgate the statutorily mandated regulations. Morrison II, 686 F.3d. At 100-101 citing Day Wholesale, 856 N.Y.S.2d at 808. In 2009, the Fourth Department issued Cayuga Indian Nation of New York v. Gould, 884 N.Y.S.2d 510 (4th Dept. 2009) [referred to as "Cayuga I"] which held that: § 471–e "exclusively governs the imposition of sales and excise taxes on cigarettes sold on a qualified reservation;" that because §471–e was not "in effect," "there [was] no statutory basis for the imposition of a cigarette tax on a qualified reservation;" and consequently that "possession or sales of untaxed

---

[5] Section 471–e also provided that "[q]ualified Indians may purchase cigarettes from a reservation cigarette seller exempt from the cigarette tax even though such cigarettes will have an affixed cigarette tax stamp." N.Y. Tax Law § 471–e(1)(b) (McKinney 2010) (subsequently amended 2010).

5

cigarettes on qualified reservations [could not] subject the seller or possessor to criminal prosecution." Cayuga I, 884 N.Y.S.2d at 510. Cayuga I led to a conflict between the Fourth Department and the federal court for the Eastern District of New York which issued a decision contrary to Cayuga I in City of New York v. Golden Feather Smoke Shop, Inc., 2009 WL 2612345 (E.D.N.Y. Aug. 25, 2009) [referred to as "Golden Feather I"]. In Morrison II, the Second Circuit summarized the conflict:

> A conflict soon developed between the Fourth Department and the federal court for the Eastern District of New York concerning New York's authority to tax on-reservation cigarette sales to non-tribal members. In [Golden Feather I], the City of New York sued a series of on-reservation cigarette retailers in federal court, seeking injunctive relief, penalties, and damages under the CCTA. The district court granted the City's motion for a preliminary injunction. ... In doing so, the Golden Feather I court determined that "the New York Court of Appeals would reject the majority's reasoning in [Cayuga I] and conclude that § 471 imposes a tax on reservation sales of cigarettes to non-Tribe members." ... The [Eastern District of New York] thus made its own interpretation of Section 471, and, under this interpretation criminal prosecutions of Native American retailers who sold untaxed cigarettes on-reservation to non-tribal members were permitted. The defendants in Golden Feather I appealed the district court's decision to our Court.

Morrison II, 686 F.3d. at 101. In City of New York v. Golden Feather Smoke Shop, Inc., 597 F.3d 115 (2d Cir 2010) [referred to as "Golden Feather II"], the Second Circuit determined that it was appropriate to seek the guidance of the New York Court of Appeals in interpreting New York's Tax Law. Thus, the Second Circuit certified the following two questions:

> (1) Does N.Y. Tax Law § 471–e, either by itself or in combination with the provisions of § 471, impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?

> (2) If the answer to Question 1 is "no," does N.Y. Tax Law § 471 alone impose a tax on cigarettes sold on Native American reservations when some or all of those cigarettes may be sold to persons other than members of the reservation's nation or tribe?

Golden Feather II, 597 F.3d at 127-128. At the time the Second Circuit certified these questions, the Court noted that an appeal of Cayuga I was itself pending before the New York Court of Appeals. Golden Feather II, 597 F.3d at 127. On August 20, 2010, the Second Circuit recalled the questions as being moot in light of the New York Court of Appeals' decision in Cayuga Indian Nation v. Gould, 14 N.Y.3d 614, 904 N.Y.S.2d 312, 930 N.E.2d 233 (2010) [referred to as " Cayuga II "], and intervening amendments to the New York cigarette tax laws. In Cayuga II, the New York Court of Appeals ruled that there was "no question that Tax Law § 471 generally imposes a sales tax on cigarettes sold in New York." Cayuga II, 14 N.Y.3d at 647, 904 N.Y.S.2d 312, 930 N.E.2d 233. The New York Court of Appeals held that Section 471–e was not "in effect," but that this did not present barriers to prosecutions of "large-scale cigarette bootlegging activities engaged in by Indian and non-Indian traders" when such prosecutions were undertaken pursuant to Section 471 only. Cayuga II, 14 N.Y.3d at 652, 904 N.Y.S.2d 312, 930 N.E.2d 233. Moreover, the New York Court of Appeals explicitly stated that the schemes involved in Golden Feather and in Morrison were the kind of "large-scale bootlegging activities" that are properly subject to prosecution under Section 471. Cayuga II, 14 N.Y.3d at 653, 904 N.Y.S.2d 312, 930 N.E.2d 233.

In the instant case, the defendant argues that in light of the legislative and judicial history regarding the validity of §471, he was "insufficiently warned," and thus, cannot be held criminally liable for "failing to recognize that he was prohibited from selling unstamped

7

cigarettes on Native American reservations to non-Native Americans during the time period covered by the indictment." Docket No. 32 at page 7). The defendant relies on the District Court ruling in United States v. Morrison, 706 F.Supp.2d 304 (E.D.N.Y. 2010) [referred to as "Morrison I"]. (Docket No. 32 at page 11).[6] In Morrison I, the defendant had been convicted of several charges, including a conspiracy to violate the CCTA. The defendant argued that in light of the legislative and judicial history of §471, and the State's forbearance from enforcing this statute, that his CCTA conspiracy conviction should be vacated because he did not have sufficient notice that he could be held criminally liable for the conduct. The District Court agreed that the defendant's due process rights were violated and vacated the CCTA conviction. Morrison I, 706 F.Supp.2d at 313.

Subsequent to the defendant's motion in the instant case, however, the Second Circuit reversed the District Court ruling in Morrison I that there was constitutionally insufficient notice to enforce §471 and the CCTA. Morrison II, 686 F.3d.94. The Second Circuit's recent decision in Morrison II is particularly instructive. As in the instant case, the conduct in Morrison II occurred prior to 2005. Morrison II, 686 F.3d at 100. As in the instant case, Morrison argued before the District Court that §471 did not give constitutionally sufficient notice to potential criminal defendants. In reversing the District Court, the Second Circuit rejected this argument in Morrison II. The Second Circuit held that the fact that the neither the history of §471, nor the fact that the Court had certified questions to the New York Court of Appeals in Golden Feather II

---

[6] The defendant actually cites to United States v. Morrison, 656 F.Supp.2d 338 (E.D.N.Y. 2009)(Docket No. 32 at page 11). This is an earlier District Court decision which dealt with the proceeds attributed to the sale of unstamped cigarettes and the defendant's burden to establish the cost he paid for the cigarettes. The District Court ruling as to the defendant's due process claim is included in 706 F.Supp.2d. 304 (E.D.N.Y. 2010).

8

suggested that §471 was impermissibly vague. Morrison II, 686 F.3d. at 103. To the contrary, citing to the "plain language" of §471, the Second Circuit stated that its decision in Golden Feather II demonstrated its understanding that §471 was not unconstitutionally vague. The Second Circuit stated:

> Indeed, far from suggesting that "the Circuit perceive[d] the applicability of § 471 to on-reservation sales as unsettled and ambiguous, i.e. not self-evident nor predictable from a simple reading of the section," ... Golden Feather II demonstrated our Court's strong sense that the plain language of Section 471 gave the State of New York the power to prosecute cigarette vendors for the on-reservation sale of unstamped cigarettes to non-tribal members. Undoubtedly, Golden Feather II 's comments regarding the plain meaning of Section 471 indicated an interpretational conflict between our Court and the Fourth Department. But it is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague. ... In sum, Golden Feather II 's decision to certify questions regarding Section 471 to the New York Court of Appeals did not indicate that [the] statute failed to describe "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." ... Indeed, certification stemmed from our understanding that, while we could rule on the issues before us, doing so was not prudent. Thus, while there may be cases in which a decision to certify could be indicative of vagueness, the present case is not one. Consequently, we reverse the district court and reinstate Morrison's conviction under Count Two.

Morrison II, 686 F.3d at 105.

The Second Circuit went on to hold that the fact that New York had refrained from enforcing §471 at the time of the conduct at issue did not preclude the defendant's conviction under that statute. In Morrison II, the Second Circuit held:

> There is, of course, no question that the conduct at issue here was made unlawful by the terms of New York's cigarette tax laws. At

9

> the time of the events that form the basis of Morrison's prosecution, New York State imposed a tax on all cigarettes sold within the state, with an exception for those sales where the state was "without power to impose such a tax." N.Y. Tax Law § 471(1). The Supreme Court had held that the states could properly impose taxes on cigarettes that were sold on reservation to non-Native Americans. Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 151, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). Moreover, the Court had specifically upheld New York's tax regime, as it pertained to on-reservation cigarette sales to non-Native Americans. See Milhelm Attea, 512 U.S. at 78, 114 S.Ct. 2028. Consequently, New York's decision, for political and practical reasons, to refrain from enforcing Section 471 did not grant Morrison leave to sell massive quantities of untaxed cigarettes to non-Native Americans. New York had the power to impose that tax and state law mandated that the tax be paid. New York's forbearance policy did not free him to engage in conduct that the law forbade, for, as the Supreme Court has stated, "The failure of the executive branch to enforce a law does not result in its modification or repeal." District of Columbia v. John R. Thompson Co., 346 U.S. 100, 113–14, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953).

Morrison II, 686 F.3d. at 105-106. The Second Circuit noted that the CCTA was designed to provide federal support to the states in enforcing their tax laws. Morrison II, 686 F.3d. at 106. Reviewing the history of New York's experience in attempting to enforce the statute, the Second Circuit concluded:

> In view of this history, the forbearance policy in no way signaled New York's choice not to enforce its tax laws when such enforcement would be possible. Rather, the policy represented New York's beleaguered concession to the difficulty and danger of state-level enforcement, the complex jurisdictional issues surrounding reservation-based cigarette sales, and the politically combustible nature of bootlegging prosecutions. Congress enacted the CCTA to provide federal support to states struggling with circumstances precisely like those that prompted New York's forbearance. Accordingly, we conclude that by sustaining Morrison's conviction, we are in no way undercutting the CCTA's back-up role, but rather, are giving fullest effect to the CCTA's

10

    delicate balancing of state and federal interests.

Morrison II, 686 F.3d at 107. In light of the Second Circuit's decision in Morrison II, the defendant's motion to dismiss Counts 1 through 6 of the indictment should be denied.

## Conclusion

Based on the above, it is recommended that the motion to dismiss be denied. Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
September 20, 2012